**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **FOR PUBLICATION** |
| NOGIN COMMERCE LLC, | Chapter 7 |
| Debtor. | Case No. 25-10810 (MG) |

**MEMORANDUM OPINION AND ORDER DENYING MOTION OF ASSIGNEE**
**FOR THE BENEFIT OF CREDITORS OF NOGIN COMMERCE, LLC FOR**
**ENTRY OF AN ORDER DISMISSING THE INVOLUNTARY CHAPTER 7**
**PROCEEDING OR, IN THE ALTERNATIVE, FOR ABSTENTION AND RELATED RELIEF**

*A P P E A R A N C E S :*

MCMANIMON, SCOTLAND & BAUMANN, LLC
*Attorneys for Anthony Sodono III, Assignee for the Benefit of Creditors of Nogin Commerce LLC*
75 Livingston Avenue
Suite 201
Roseland, New Jersey 07068
By:    Michele M. Dudas, Esq.
        Anthony Sodono III, Esq.

SILLS CUMMIS & GROSS P.C.
*Attorneys for the Petitioning Creditors*
101 Park Avenue
28th Floor
New York, New York 10178
By:    S. Jason Teele, Esq.

LEVENE, NEALE, BENDER, YOO & GOLUBCHIK LLP
*Attorneys for CPH Fund I, LLC*
2818 La Cienega Avenue
Los Angeles, California 90034
By:    David L. Neale, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the motion (the "Motion," ECF Doc. # 6) of Anthony Sodono

III (the "Assignee"), assignee for the benefit of the creditors, that seeks entry of an order (i)

dismissing the involuntary chapter 7 proceeding of Nogin Commerce LLC (the "Alleged

Debtor") pursuant to 11 U.S.C. §§ 305 and 707 of the Bankruptcy Code, or (ii) in the alternative,

for abstention pursuant to 11 U.S.C. § 305 and 28 U.S.C. § 1334 and related relief.  Annexed to

the Motion is the affirmation of the Assignee in support of the Motion (the "Sodono Aff.," ECF

Doc. # 6-1).[1]

On May 19, 2025, Karen Kane Inc. ("Karen Kane"), S.K.I. Essential LLC ("SKI"), Jump

Design Group Inc. ("Jump Design") and Rujo Boots Company LLC ("Rujo Boots") (each, a

"Petitioning Creditor" and collectively, the "Petitioning Creditors") filed an opposition (the

"Opposition," ECF Doc. # 12) to the Motion.  Annexed to the Opposition is (i) the declaration of

Andrew Oshrin, president of Jump Design ("Oshrin Decl.," ECF Doc. # 12-1), and (ii) the

declaration of S. Jason Teele, partner at Sills Cummis & Gross, P.C. and counsel to the

Petitioning Creditors (the "Teele Decl.," ECF Doc. # 12-2).

Subsequently, on May 27, 2025, the Assignee filed a reply (the "Reply," ECF Doc. # 18)

to the Opposition.  Annexed to the Reply is (i) the declaration of the Assignee (the "Sodono

Decl.," ECF Doc. # 18-1),[2] and (ii) the declaration of Jonathan S. Huberman, former Chief

Executive Officer ("CEO") of the Alleged Debtor (the "Huberman Decl.," ECF Doc. # 18-3).

That same day, CPH Capital Fund I, LLC ("CPH"), a senior secured creditor of the Alleged

Debtor, also filed a joinder (the "CPH Joinder," ECF Doc. # 16) in support of the Motion.

On June 9, 2025, the Court held a hearing on the Motion (the "Hearing").

---

[1]      Annexed to the Sodono Aff. are copies of the following: (i) the Software License Agreement (the "License
Agreement") with Cart.com as Exhibit A; (ii) the Deed of Assignment for Benefit of Creditors (the "Deed") as
Exhibit B; (iii) the Order to Show Cause ("OSC") entered in the assignment proceeding in the Supreme Court of
New York and related pleadings as Exhibit C; and (iv) certain correspondence with Cart.com as Exhibit D.

[2]      Annexed to the Sodono Decl. are copies of the following: (i) relevant portions of the U.S. Trustee
Handbook for Chapter 7 Trustees as Exhibit A; (ii) recent examples of orders authorizing sales free and clear in
unrelated matters as Exhibit B; and (iii) a letter of intent with Cart.com (the "LOI") as Exhibit C.

For the reasons discussed, the Court **DENIES** the Motion.

## I.   BACKGROUND

### A.  Relevant Background

#### 1.  The Alleged Debtor

The Alleged Debtor is a Delaware limited liability company with offices at 15 West 38th Street, Suite 501, New York, New York 10018.  (Motion at 1.)  The Alleged Debtor managed e-commerce for top brands in apparel, outdoor, health, household goods, as well as other areas. (*Id.*; *see also* Opposition ¶ 1 (indicating that the Alleged Debtor "operated an e-commerce and technology platform enabling business-to-consumer and business-to-business commerce for companies in the apparel, accessories, and related industries").)

The Petitioning Creditors indicate that the Alleged Debtor was "responsible for marketing, shipping, credit card processing, and collecting payment for goods sold through its platform on behalf of its suppliers."  (*Id.* ¶ 3.)  For each transaction, the Alleged Debtor would receive a fee and remit the balance of the sale price to the supplier on a monthly basis.  (*Id.*)  The Alleged Debtor would also collect and remit sales tax to the applicable governmental unit.  (*Id.*) The Opposition states that the Alleged Debtor collected approximately $10 million per month from purchasers of products on its online sales platform.  (*Id.* ¶ 4.)

#### 2.  License Agreement and Deed of Assignment

On March 22, 2025, the Alleged Debtor entered into the License Agreement with Cart.com, Inc. ("Cart.com") for the license of the Alleged Debtor's technology.  (Motion at 1.) The Motion indicates that Cart.com had taken "certain actions," including the transitioning of the Alleged Debtor's customer accounts from Shopify to Cart.com in an effort to "minimize disruptions to the Alleged Debtor's customers."  (*Id.*)

On March 31, 2025, the Deed was delivered to and accepted by the Assignee pursuant to Article 2 of the New York Debtor and Creditor Law ("NYDCL"). (*Id.* at 1–2.)

### 3. The Alleged Debtor's Assets

The Alleged Debtor's main assets (collectively, the "Assets") comprise: (i) its intellectual property and technology platform (the "Technology"); (ii) fifty (50%) percent ownership interest in Bicoastal Alliance LLC ("Bicoastal"); and (iii) cash on hand of approximately $650,000, which is maintained in the Assignee's bank account that was specifically designated for the Alleged Debtor. (*Id.* at 2.) The Assignee indicates that the Technology and ownership interests in Bicoastal are "identified for the Court as items capable of being sold or transferred in the Assignment Proceeding" (as defined below) along with other causes of action, including "avoidance-type" actions pursuant to NYDCL. (*Id.*) Finally, the Assignee further indicates that the Alleged Debtor owes secured debt to CPH in excess of $17 million that it believes exceeds the value of the Assets. (*Id.*)

### 4. Assignment Proceeding and the Order to Show Cause

On April 8, 2025, an order to show cause and related pleadings regarding the commencement of the assignment proceeding were filed with the Supreme Court of New York, New York County, Docket No. 154700/2025 (the "Assignment Proceeding"). (*Id.* at 2; *see also* Opposition ¶ 17 (indicating that the Assignee filed a petition requesting the commencement of an assignment for the benefit of creditors of the Alleged Debtor in New York state court).) The Honorable Mary V. Rosado, J.S.C. was assigned to the matter, and Judge Rosado entered the OSC on April 14, 2025, that scheduled a hearing date for May 20, 2025.[3] (Motion at 2.) The

---

[3] The Opposition states that the OSC will, in part, "determine whether the New York Court will commence an assignment for the benefit of creditors of the Assignor and establish a deadline for filing proofs of claim in the putative Assignment Proceeding." (Opposition ¶ 18.) The parties indicated at the Hearing that an adjournment of the May 20 hearing has been requested in light of the filing of the involuntary chapter 7 case.

4

Petitioning Creditors make clear that the Assignment Proceeding will not formally commence until the New York court "acts on the [OSC] following the scheduled hearing." (Opposition ¶ 18.)

The Assignee indicates that various customers of the Alleged Debtor were notified of the filing. (Motion at 3.) However, the Petitioning Creditors indicate that at least Jump Design was not given notice despite holding a claim of approximately $400,000.00 as well as the Alleged Debtor's former employees. (*See* Opposition ¶ 20 (stating further that it is unclear whether the Assignee failed to give notice to other creditors or parties in interest in the Assignment Proceeding).) Moreover, the Assignee further indicates that it has provided proof of claim forms and fielded calls from numerous creditors. (Motion at 3.) Despite no official bar date being set in the Assignment Proceeding, the Assignee received in excess of a dozen claims from creditors. (*Id.*; *see also* Opposition ¶ 18 (making clear that the deadline for creditors to file proofs of claim in the Assignment Proceeding will not be established until the New York court acts on the OSC).)

In addition, prior to and since the acceptance of the Deed, the Assignee and its counsel have spent significant time engaging in numerous discussions regarding the operation of the Alleged Debtor's business, particularly as it relates to the transitional services by Cart.com, the offboarding of employees, and the potential sale of the Alleged Debtor's Technology and ownership interests in Bicoastal. (Motion at 3.) Additionally, the Assignee's proposed accountants, Eisner Advisory Group, have also had discussions with the Alleged Debtor's former professionals to address various tax-related issues. (*Id.*)

     5.  <u>The Alleged Debtor's Predecessor's Prior Bankruptcy and the Present
Involuntary Chapter 7 Proceeding</u>

On April 24, 2025, the Petitioning Creditors, without prior notice, commenced the above-caption involuntary chapter 7 proceeding.  (*Id.* at 3.)  The Petitioning Creditors indicate that the case was filed "due to concerns of, among other things, lack of payment and lack of communication from the Alleged Debtor regarding the status of its business and the findings made during pre-filing diligence about the circumstances surrounding the sudden shut down of the Alleged Debtor's business."  (Opposition ¶ 14.)

The Assignee contends that the bankruptcy case is resulting in "unnecessary confusion and delay" and could "detrimentally impact any sale of the . . . Assets."  (Motion at 4 (noting further that the Assignee received the LOI from Cart.com on May 1, 2025, and is in the process of reviewing the offer).)

The Petitioning Creditors indicate that the Alleged Debtor's predecessor had a prior chapter 11 case.  Specifically, on December 5, 2023, Nogin Inc. ("Old Nogin"), the Alleged Debtor's predecessor, filed a voluntary chapter 11 petition in the U.S. Bankruptcy Court for the District of Delaware.  (Opposition ¶ 8 (citing *In re Nogin, Inc., et al.*, Case No. 23-11945 (CTG) (Bankr. D. Del.).)  In that case, B. Riley Securities Inc. ("B. Riley") was a pre- and post-petition lender to Old Nogin that sponsored Old Nogin's plan, which was confirmed on March 28, 2024, and went effective on May 3, 2024.  (*Id.* ¶¶ 9–10, 12.)  Under the plan, B. Riley was to purchase 100% of the reorganized Old Nogin's equity.  (*Id.* ¶ 10.)  Accordingly, the Alleged Debtor here is the entity whose equity B. Riley acquired in Old Nogin's chapter 11 case.  (*Id.*)

**B.  The Motion**

The Assignee seeks dismissal of the involuntary chapter 7 case or, alternatively, for the Court to abstain so that the Assignment Proceeding can proceed.  (Motion at 4.)  The Assignee

further seeks payment of costs and attorneys' fees on a joint and several basis, including

damages to the value of the Assets and the Alleged Debtor's business stemming from delays in

the administration of the Assignment Proceeding as a result of the bankruptcy filing. (*Id.*)  At a

minimum, the Assignee argues that the Petitioning Creditors should be required to post a bond

pursuant to 11 U.S.C. § 303(e) to indemnify the assignment estate for amounts the Court may

award pursuant to 11 U.S.C. § 303(i). (*Id.* at 4–5.)

    1.  Dismissal Pursuant to 11 U.S.C. §§ 305 and 707(a)

The Assignee indicates that dismissal pursuant to section 305(a) of the Bankruptcy Code

is appropriate where the "interests of creditors and the debtor would be better served by such

dismissal or suspension." (*Id.* at 5 (quoting 11 U.S.C. § 305(a).)  Moreover, dismissal pursuant

to section 707(a) of the Bankruptcy Code is also appropriate, the Assignee maintains, since it can

satisfy several of the factors articulated in *Wilk Auslander LLP v. Murray (In re Murray)*, 543

B.R. 484, 492 (Bankr. S.D.N.Y. 2016) ("*Murray I*"), *aff'd*, 565 B.R. 527 (S.D.N.Y. 2017), *aff'd*,

900 F.3d 53 (2d Cir. 2018) in determining whether cause exists to justify dismissal. (*Id.* at 5.)

The factors include: (i) prosecution of fraudulent transfers in another forum; (ii) the Petitioning

Creditors having adequate remedies to enforce their claims under non-bankruptcy law; (iii) no

assets being lost or dissipated in the event the bankruptcy case does not continue; and (iv) the

Alleged Debtor, a limited liability company, not needing or even being entitled to a bankruptcy

discharge. (*Id.* at 5–6.)  The Assignee further asserts that the Petitioning Creditors have not

articulated what rights a bankruptcy trustee has that an Assignee does not under NYDCL. (*Id.* at

6.)  Rather, it argues that all rights of Petitioning Creditors will be protected in the Assignment

Proceeding since the Assignee's rights and duties are comparable to a bankruptcy trustee's. (*Id.*)

2.  Abstention Pursuant to 11 U.S.C. § 305 and 28 U.S.C. § 1334(c)

In the alternative, in the event the Court elects not to dismiss the bankruptcy case, the Assignee requests that the Court abstain from hearing the case.  (*Id.* at 7.)  It cites to several factors in support, including (i) economy and efficiency of administration; (ii) the availability of another forum—*i.e.*, the New York Supreme Court; (iii) the Petitioning Creditors failure to articulate why or how federal proceedings are necessary to reach a just and equitable solution based upon the Assignee's powers under NYDCL; (iv) whether an alternative means of achieving equitable distribution of assets exists; (v) the fact that the Deed was received by the Assignee over one month ago, and the Assignment Proceeding has been pending for several weeks and it would not be cost effective to start anew; and (vi) the lack of a stated purpose for which bankruptcy jurisdiction has been sought.  (*Id.*)

Abstention is also appropriate, the Assignee argues, because, among other things, (i) the Assignment Proceeding was filed several weeks prior to the involuntary bankruptcy case; (ii) the Assignee was put into place and retained professionals who have "undertaken significant efforts" concerning the Alleged Debtor's business and Assets; (iii) the OSC and related pleadings were filed, prepared, and served, and "significant discussions" regarding the sale of certain of the Alleged Debtor's Assets have taken place; (iv) more than 100 creditors were served with the Assignee's pleadings; (v) the Assignee is unaware of any "predominant bankruptcy issues" that cannot be addressed in the Assignment Proceeding or any "difficult or unsettled" applicable state law; (vi) the New York Supreme Court is overseeing the Assignment Proceeding, and there is no justification to displace it; (vii) the Assignment Proceeding is a state court alternative for the orderly liquidation of the Assets; (viii) there is generally no right to a jury trial in bankruptcy courts; and (ix) prejudice to the Alleged Debtor from the stay of the Assignment Proceedings

outweighs any prejudice to the Petitioning Creditors. (*Id.* at 8 (asserting that each of the factors to consider in determining whether permissive abstention is appropriate has been satisfied).)

### 3.  Award of Costs and Attorneys' Fees Pursuant to 11 U.S.C. § 303(i)(1)

An award of costs and attorneys' fees is appropriate, the Assignee argues, because the Petitioning Creditors failed to provide notice of the bankruptcy case to the Assignee prior to its filing. (*Id.* at 9.)  As a result, the Assignment Estate has been prejudiced and the value of the Alleged Debtor's business has been harmed. (*Id.*)  Moreover, the Alleged Debtor's customers also face the possibility of "irreparable harm" should the "business go dark during this transition period." (*Id.*)  Such an award would discourage improper filings of involuntary proceedings and would make the Alleged Debtor whole. (*Id.* at 10.)

The Assignee further requests that the Petitioning Creditors be required to post bond to indemnify the Assignment Estate for amounts that may be awarded under section 303(i)(1) of the Bankruptcy Code. (*Id.*)

### C.  The Opposition

#### 1.  The Petitioning Creditors' Allegations

The Petitioning Creditors allege that in the weeks prior to March 16, 2025, the date the Alleged Debtor's business shut down, the Alleged Debtor diverted cash it was holding for the benefit of suppliers to other parties. (Opposition ¶ 4; *see* Oshrin Decl. ¶ 7 (indicating that the Alleged Debtor owes at least $3.3 million to the Petitioning Creditors).)  While they have been unable to ascertain the identity of the recipients of the cash, they believe that "substantially all of the supplier cash was transferred to [B. Riley], the Alleged Debtor's parent company, or [CPH], an alleged lender to the Alleged Debtor." (*Id.*)  On March 31, 2025, the Alleged Debtor had

approximately $650,000 cash on hand, all of which the Petitioning Creditors believe was for the "sale of supplier property." (*Id.*)

Meanwhile, the Opposition contends that suppliers were unaware of the Alleged Debtor's financial condition or that supplier funds were being diverted "until it was too late." (Opposition ¶ 5.) Rather, the Alleged Debtor allegedly "concealed its financial condition from its suppliers, even while it continued to sign new suppliers to use its e-commerce platform and incur significant liabilities to its suppliers through ongoing sales." (*Id.*) The Alleged Debtor, the Petitioning Creditors indicate, operated in the normal course until it ceased business operations on or about March 16, 2025, and issued a notice to its suppliers. (*Id.* ¶¶ 6–7.) This notice was the "first time" the Petitioning Creditors learned that the Alleged Debtor's business was in trouble. (*Id.* ¶ 7.) The notice further disclosed that the Alleged Debtor had entered into a transaction with Cart.com to license its technology platform to Cart.com. (*Id.*) In exchange, Cart.com "offered to enter into new commercial agreements with interested parties to provide similar services to those currently being provided by [the Alleged Debtor]." (*Id.* (quoting Oshrin Decl. ¶ 10 & Ex. A) (alterations in original).) It also made clear that Cart.com "currently employs, and is working on potential employment opportunities with, former [employees of the Alleged Debtor] who are familiar with the specifics of [the Alleged Debtor's] business." (*Id.* (quoting the same).)

Following the closure of business operations, the Petitioning Creditors indicate that the Alleged Debtor's former CEO notified the CEO of Jump Design that "B. Riley made the decision to shut off its financial support for the business and to shut it down." (*Id.* ¶ 6.) The Petitioning Creditors argue that because the Alleged Debtor had collected and held "millions of dollars for the benefit of its suppliers," they believe that "the directors and officers of the Alleged Debtor

and B. Riley, and likely [CPH], among others, either knew or should have known that supplier

proceeds were being diverted, and some of those parties allegedly participated in diverting those

funds." (*Id.*)

The Petitioning Creditors state that, according to the Assignee, the Alleged Debtor's

secured and unsecured debts total $35,474,858.81. (*Id.* ¶ 19.) However, they believe that the

Alleged Debtor's actual unsecured debt is substantially higher because (i) the Assignee allegedly

failed to list all known creditors, including Jump Design who holds a "claim of at least

$382,286.52," and (ii) the claim amounts for other Petitioning Creditors are incorrect. (*Id.*)

Specifically, (i) the claim of Karen Kane is listed as $1,186,076.93 but is actually no less than

$2,106,427.15; (ii) the claim of SKI is listed as $120,037.63 but is actually no less than

$418,474.00; and (iii) the claim of Rujo Boots is listed at $222,053.97 but is actually no less than

$427,252.13. (*Id.* at 6 n.4.)

### 2. The Petitioning Creditors' Arguments

#### a. *Allegations of Lack of Due Diligence Are Without Merit*

The Petitioning Creditors assert that the Assignee's allegation that they failed to engage

in due diligence prior to the filing of the involuntary chapter 7 petition is without merit. (*Id.* ¶¶

21–22 (setting forth, among other things, a "non-exhaustive list" of the diligence conducted).) In

fact, not only was the Petitioning Creditors' pre-filing diligence extensive, such diligence, they

indicate, continued post-petition. (*Id.* ¶ 24.) They further note that they engaged in discussions

with the Assignee regarding why the bankruptcy case should be dismissed, accounting for the

Assignee's articulated reasons for why the Petitioning Creditors should consent to dismissal and

found each to be unpersuasive. (*Id.* ¶ 25 (indicating, among other things, that the Petitioning

Creditors believed that a bankruptcy proceeding afforded "substantial benefits" over an

11

Assignment Proceeding; the Assignee failed to properly notice the Assignment Proceeding; there

was "no evidence of any sale efforts" despite the Assignee's representations; the Assignment

Proceeding has not progressed; the Cart.com transaction occurred well before the assignment and

a full investigation of the transaction is necessary, including by a "truly independent fiduciary";

and a chapter 7 trustee's powers and duties were "far greater" than those of an Assignee and

would result in a more "complete and unbiased investigation").)  Indeed, the Petitioning

Creditors' diligence both pre- and post-petition, they maintain, reflected the need for an

"independent fiduciary to immediately take possession of the Alleged Debtor's estate to protect

and maximize the value of those assets for the benefit of all creditors."  (*Id.* ¶ 28.)

### b.   The Requirements of Section 303 Have Been Satisifed

The Petitioning Creditors argue, therefore, that the involuntary chapter 7 case, which was

commenced pursuant to section 303 of the Bankruptcy Code, should not be dismissed.  As an

initial matter, they believe that they have satisfied the requirements of section 303(b) and have

properly filed the chapter 7 case since (i) the Petitioning Creditors "filed the petition with claims

substantially in excess of the required amount," and (ii) the Assignee has not challenged the

"eligibility of the Petitioning Creditors' claims by the Assignee" nor could it.  (*Id.* ¶ 32.)

### c.   No Murray Factor Supports Dismissal Under Section 707(a)

Contrary to the Assignee's assertions, the Petitioning Creditors also contend that not a

single *Murray* factor warrants dismissal.  Specifically, they argue that (i) the first, second, sixth,

seventh, and eighth *Murray* factors are inapplicable; (ii) there are "many competing creditors"

who are similarly situated; (iii) a bankruptcy trustee's powers compared to an assignee's make

the Court a more "favorable forum" for the pursuit of fraudulent transfers, among other things;

(iv) the risk of dissipation of assets is greater in the Assignment Proceeding; and (v) the Alleged

Debtor is ineligible for a discharge in chapter 7 because it has ceased operating and its assets will be liquidated.  (*Id.* ¶¶ 35–42.)

        *d.   The Trustee Has Greater Powers Than the Assignee, Bringing Benefits to Creditors*

The Petitioning Creditors believe there are "significant differences" between the powers and duties of a trustee under the Bankruptcy Code and the Assignee under New York law.  (*Id.* ¶ 43.)  The powers of a bankruptcy trustee, they submit, would ensure a "comprehensive and effective investigation and pursuit of claims" that would benefit all creditors.  (*Id.*)  These differences include: (i) the automatic stay and the power of bankruptcy trustee to sell assets "free and clear," both of which are absent under New York law;[4] (ii) the Court's removal jurisdiction to centralize all disputes to a single forum; (iii) the requirement of bankruptcy court approval of a sale that would afford more transparency; (iv) the trustee's ability to assume and assign executory contracts and unexpired leases, which a New York assignee is unable to do; (v) the trustee's ability to conduct nationwide service of process under Rule 7004 of the Federal Rules of Bankruptcy Procedure versus an assignee who is limited to jurisdictional limits under New York law; (vi) the limited nature of the New York analog to Rule 2004 of the Federal Rules of Bankruptcy Procedure; (vii) the Bankruptcy Code's requirement for disclosures than exceeds those required under New York law; (viii) statutory determination of a trustee's commission as opposed to determination by a court; and (ix) the U.S. Trustee's appointment of a trustee as an independent fiduciary as compared to the Assignee who was selected by the Alleged Debtor.  (*Id.*)

---

[4]     The Petitioning Creditors note further that the Alleged Debtor is party to at least four lawsuits.  (Opposition ¶ 43.)

*e.  Independent Investigation by an Independent Fiduciary is Necessary*

The Petitioning Creditors believe that there is a need for an independent fiduciary to investigate the circumstances surrounding the closure of the Alleged Debtor's business and its transfer of assets and employees to Cart.com.  (*Id.* ¶ 45.)  Such an investigation, they argue, may result in the pursuit of claims against directors and officers of the Alleged Debtor and other parties for, among other things, breach of duty, defalcation, and conversion.  (*Id.* (citing to *In re Scandia Seafood (New York), Inc.*, 2017 WL 2062894 (Bankr. S.D.N.Y. May 12, 2017) and arguing that similar circumstances exist here that also warrant a denial of dismissal of an involuntary petition).)

*f.  The Court Should Not Abstain*

Due to the need for an independent third-party investigation, the Petitioning Creditors believe that abstention is also not appropriate.  (*Id.* ¶ 47.)  Each of the seven factors courts consider when deciding whether abstention is appropriate, they argue, weigh "heavily" in favor of not abstaining.  (*Id.* ¶ 48; *see also id.* ¶¶ 49–55 (asserting that a trustee can administer the case more "efficiently and . . . transparently" than the Assignee while maximizing value for the estate; creditors are not receiving "attentive and diligent representation of their interests" in the Assignment Proceeding; a trustee is needed to conduct a proper investigation as the Assignee does not have the same powers as a trustee and cannot conduct an investigation given the shutdown and diversion of funds; the bankruptcy case will not be duplicative of the Assignment Proceeding; and the involuntary chapter 7 petition was filed in good faith).)

*g.  Damages or Sanctions Are Not Proper*

As the filing of the involuntary chapter 7 petition has not resulted in any delays in the Assignment Proceeding, the Assignee's request for damages or sanctions, the Petitioning

14

Creditors argue, should be denied.  (*Id.* ¶ 57.)  Indeed, they indicate that the Assignment

Proceeding has not commenced and will not commence until the New York state court acts on

the OSC, and the Assignee had requested an adjournment of the hearing on the OSC due to the

commencement of this chapter 7 case and the pending Motion.  (*Id.*)  No showing of a delay can

be established and, instead, the Petitioning Creditors believe that they have filed this case in

good faith.  (*Id.* ¶¶ 57, 60; *see also id.* ¶¶ 61–69 (indicating that the petition was filed in good

faith because the requirements of section 303 of the Bankruptcy Code were satisfied and, among

other things, the Petitioning Creditors performed adequate due diligence prior to filing, which

was not done to harass the Alleged Debtor but rather to protect the Alleged Debtor's assets from

dissipation).)

### D.  The Reply

The Assignee argues that dismissal is appropriate as the Petitioning Creditors assert

nothing but "speculative and . . . false assumptions, and hearsay allegations in their attempt to

have the Motion denied."  (Reply at 1.)  The Assignee highlights that he is an independent

fiduciary whose powers and duties under New York law are akin to those of a chapter 7 trustee.

(*Id.* at 1–2.)  Rather, he contends that it is the Petitioning Creditors who have failed to act in

good faith by filing the involuntary chapter 7 case and that the Assignment Proceeding was

intended to minimize their exposure to preference liability.[5]  (*Id.* at 2.)  As support, the Assignee

provides the following chart to illustrate the potential difference in recovery between an

Assignment Proceeding and the present bankruptcy case for each Petitioning Creditor:

---

[5]      The Assignee indicates that section 15 of NYDCL authorizes the Assignee to recover preferential transfers
made within four months of the assignment (*i.e.*, Nov. 30, 2024 through March 31, 2025).  (Reply at 2.)

15

| Petitioning Creditor | Four (4) Month Analysis from March 31, 2025 (date of Deed of Assignment) | Ninety (90) Day Analysis from April 24, 2025 (filing date of involuntary petition) |
|---|---|---|
| Karen Kane | $3,746,769.44 | $1,463,447.44 |
| Jump (Bebe) | $1,532,903.54 | $361,399.41 |
| S.K.I. (Goodlife) | $545,082.98 | $69,769.98 |
| Rujo | $1,172,403.95 | $146,233.85 |
| **Total** | **$6,997,159.91** | **$2,040,850.68** |

(*Id.* at 3.)  Additionally, the Assignee disputes the differences between assignment proceedings under New York law and chapter 7 proceedings under the Bankruptcy Code the Petitioning Creditors have highlighted, arguing that the two are, in fact, comparable.  (*Id.* at 4–7.)

To address the Petitioning Creditors' concerns over the "viability of any alleged sale" to Cart.com, the Assignee notes that Cart.com entered into the LOI with the Assignee for the purchase of certain assets (*i.e.*, the Nogin platform, certain registered IP, and photo studio equipment).  (*Id.* at 7; *see generally* LOI.)  The purchase price under the LOI is (i) $500,000.00 and (ii) Class C Common equity with a value of $3.5 million based on the latest Series C valuation of $51.5952 per share.  (LOI at 1.)  The LOI further provides that "[o]nce and only if the Bankruptcy Case is dismissed, the sale will be subject to higher and better offers, and approval of the Court in the Assignment Proceeding.  If the [Motion] is denied and/or the Bankruptcy Case is not dismissed, this [LOI] and any resulting agreement is automatically deemed null and void."  (*Id.* at 1–2.)

The Assignee lastly argues that the *Scandia Seafood* case is distinguishable since it involved, among other things, an assignment for the benefit of creditors proceeding under New Jersey law.  (*Id.* at 7–8.)

### E.  The CPH Joinder to the Motion

CPH submits that it is a senior secured lender of the Alleged Debtor.[6]  As set forth in the CPH Joinder, the Alleged Debtor borrowed $15 million from CPH under a senior secured convertible note, dated May 3, 2024, that is secured by a first lien on "substantially all" of the Alleged Debtor's assets pursuant to a Pledge and Security Agreement also dated May 3, 2024. (CPH Joinder ¶ 1.)  By virtue of its position, CPH indicates that it is the Alleged Debtor's largest creditor.  (*Id.* ¶ 3.)

CPH indicates that it is supportive of the Assignee's sale efforts in connection with the Assignment Proceeding and believes the Assignee has been diligently working towards maximizing the sale price.  (*Id.* ¶ 2.)  It further believes that the Cart.com transaction is the "best possible option under the circumstances" and, if consummated, would permit "continuity in the operation of the Alleged Debtor's business and preservation of the Alleged Debtor's employees and customers."  (*Id.* ¶ 3.)  Indeed, it has consented to the sale despite the fact that proposed sale proceeds will be insufficient to pay its secured claim in full and result in a deficiency claim for CPH in the amount of $13.5 million.  (*Id.*; *see also id.* ¶ 5 (stating that the deficiency claim will constitute the largest unsecured claim against the estate).)  It believes that the chapter 7 filing has been detrimental as it has resulted in delays and could also lead to the loss of Cart.com as a buyer for the Alleged Debtor's assets.  (*Id.*)

The CPH Joinder makes clear that CPH will move for stay relief to foreclose on its collateral if the chapter 7 case proceeds since (i) there is no equity in the assets, and (ii) only liquidation is contemplated.  (*Id.* ¶ 4.)  Also, given that any deficiency claim it holds would

---

[6]    The Petitioning Creditors have expressed doubt over whether CPH is truly a secured creditor of the Alleged Debtor.

likely be approximately four times the amount of claims held by the Petitioning Creditors, the

"largest beneficiary of any recoveries in a chapter 7 case would primarily be CPH." (*Id.* ¶ 5.)

CPH, therefore, indicates that it does not desire the "cost or delay of a chapter 7 case" and does

not believe that any beneficial purpose will be served by these bankruptcy proceedings. (*Id.* ¶¶

5–6.) Rather, any of the Petitioning Creditors' concerns can be addressed in the Assignment

Proceeding. (*Id.* ¶ 6.)

## II.   <u>LEGAL STANDARD</u>

### A.  Commencement of an Involuntary Chapter 7 Case

Section 303(b)(1) of the Bankruptcy Code provides, in pertinent part:

> An involuntary case . . . is commenced by the filing with the bankruptcy
> court of a petition . . . (1) by three or more entities, each of which is . . . a
> holder of a claim . . . that is not contingent as to liability or the subject of a
> bona fide dispute as to liability or amount . . . if such noncontingent,
> undisputed claims aggregate at least $18,600 more than the value of any
> lien on property of the debtor securing such claims held by the holders of
> such claims.

11 U.S.C. § 303(b)(1).  "A creditor must satisfy both prongs of this test: the claim must not be

subject to a bona fide dispute either as to liability or as to amount." *In re TPG Troy, LLC*, 492

B.R. 150, 159 (Bankr. S.D.N.Y. 2013) ("*Troy I*").

The Second Circuit in *Crest One SpA v. TPG Troy, LLC (In re TPG Troy, LLC)*, 793 F.3d

228 (2d Cir. 2015) ("*Troy II*"), affirmed the bankruptcy court's decision in *Troy I*, and held that

courts must apply an objective standard to determine whether a bona fide dispute exists. The

court stated:

> A court must determine whether there is an objective basis for either a
> factual or a legal dispute as to the validity of the debt.  There is a bona fide
> dispute if there is either a genuine issue of material fact that bears upon the
> debtor's liability or a meritorious contention as to the application of law to
> undisputed facts. . . . The petitioning creditor bears the initial burden of
> coming forward with evidence to establish a prima facie case that no bona

fide dispute exists. Once a prima facie case has been established, the burden
shifts to the debtor to demonstrate the existence of a bona fide dispute.

*Troy II*, 793 F.3d at 234 (internal quotation marks and citations omitted). Once the bankruptcy

court determines that there is a bona fide dispute, it is not the proper forum to resolve it. *See id*.

("An involuntary bankruptcy case cannot be the means of pressuring a debtor to pay a

legitimately disputed debt. . . . Critically, while a court is called upon to determine the presence

of a bona fide dispute, it is not called on to resolve such dispute.").

### B. Dismissal Pursuant to Section 707(a) of the Bankruptcy Code

Section 707 of the Bankruptcy Code provides a statutory mechanism for the dismissal of

chapter 7 cases. Specifically, it provides that a court may dismiss a case under chapter 7 of the

Bankruptcy Code after notice and a hearing and only for cause. 11 U.S.C. § 707(a). Section 707

lists three non-exclusive examples of what constitutes cause: (1) unreasonable delay by the

debtor that is prejudicial to creditors; (2) nonpayment of any fees and charges required under

chapter 123 of title 28; and (3) failure of the debtor in a voluntary case to file, within fifteen days

. . . the information required by paragraph (1) of section 521, but only on a motion by the United

States trustee. *Id.*; *see also Smith v. Geltzer (In re Smith),* 507 F.3d 64, 72 (2d Cir. 2007) ("[T]he

Bankruptcy Code does not define 'cause,' and the three examples given in section 707(a) are

illustrative, not exclusive."). Accordingly, "[a] bankruptcy court's decision to dismiss a case for

cause under section 707(a) is guided by equitable considerations and is committed to the sound

discretion of the bankruptcy court." *Wilk Auslander LLP v. Murray (In re Murray)*, 900 F.3d 53,

58 (2d Cir. 2018) ("*Murray II*"); *see also In re Oliver*, 279 B.R. 69, 70 (Bankr. W.D.N.Y. 2002)

("By its use of the word 'may,' section 707(a) imposes no mandate for the dismissal of any case,

but reserves such outcome to the sound discretion of the court in those instances where cause is

demonstrated.").

19

In assessing whether there is cause for relief under section 707(a), a court must consider "the interests of both the debtors and creditors" and consider on a case-by-case basis whether there is sufficient "cause" to warrant dismissal. *In re Somers*, 448 B.R. 677, 680 (Bankr. S.D.N.Y. 2011) (citing *Dinova v. Harris (In re Dinova),* 212 B.R. 437, 442 (B.A.P. 2d Cir. 1997)). The party moving for dismissal bears the burden of proving cause by a preponderance of the evidence. *In re Ajunwa*, No. 11-11363 (ALG), 2012 WL 3820638, at * 6 (Bankr. S.D.N.Y. Sept. 4, 2012) (citing *In re Aiello*, 428 B.R. 296, 299 (Bankr. E.D.N.Y. 2010)).

Courts will consider the following factors in deciding whether to dismiss an involuntary case:

> (1) whether the bankruptcy court was the "most recent battlefield in a long-running, two-party dispute;"
>
> (2) whether the case was brought solely to enforce a judgment;
>
> (3) whether there are any "competing" creditors;
>
> (4) the need for *pari passu* distribution;
>
> (5) the extent to which the petitioner can obtain avoidance of fraudulent transfers in another forum;
>
> (6) whether the petitioner has adequate remedies under non-bankruptcy law;
>
> (7) whether the petitioner invoked the bankruptcy laws solely to secure a benefit that could not be obtained under non-bankruptcy law and without a creditor community to protect;
>
> (8) whether assets would be lost or dissipated in the event the bankruptcy case did not continue; and
>
> (9) the alleged debtor's "want or need [for] a bankruptcy discharge."

*See Murray I*, 543 B.R. at 492. The focus is whether "dismissal would be in the best interest not only of the parties but of the bankruptcy system." *Murray II*, 900 F.3d at 58 (noting the purpose of the inquiry while affirming the bankruptcy court's consideration of the nine articulated factors).

20

### C.  Abstention Pursuant to Section 305(a) of the Bankruptcy Code

Section 305(a) of the Bankruptcy Code provides, in relevant part:

> (a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—
>
> > (1) the interests of creditors and the debtor would be better served by such dismissal or suspension . . . .

11 U.S.C. § 305(a).  "The courts that have construed § 305(a)(1) are in general agreement that abstention in a properly filed bankruptcy case is an extraordinary remedy, and that dismissal is appropriate under § 305(a)(1) only in the situation where the court finds that both 'creditors and the debtor' would be 'better served' by a dismissal." *Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462 (Bankr. S.D.N.Y. 2008) (quoting *Eastman v. Eastman (In re Eastman)*, 188 B.R. 621, 624 (9th Cir. BAP 1995)); *see also In re Schur Mgmt. Co., Ltd.*, 323 B.R. 123, 129 (Bankr. S.D.N.Y. 2005) (noting that "there is no dispute that suspension is 'an extraordinary remedy that should be used sparingly and not as a substitute for a motion to dismiss under other sections of the Bankruptcy Code'" (citation omitted)).  The same applies to suspension.  *See Eastman*, 188 B.R. at 625 (noting similar requirements under section 305(a)); *see also Monitor Single Lift*, 381 B.R. at 462 (stating that granting an abstention motion pursuant to § 305(a)(1) "requires more than a simple balancing of harm to the debtor and creditors; rather, the interests of both the debtor and its creditors must be served by granting the requested relief").

The movant "bears the burden to demonstrate that the interests of the debtor and its creditors would benefit from dismissal or suspension of proceedings under § 305(a)(1)." *Id.* at 462–63.  In determining whether to grant relief under section 305(a), courts will consider the following:

> 1) The economy and efficiency of administration;

2) Whether another forum is available to protect the interests of both parties or, there is already a pending proceeding in a state court;

3) Whether federal proceedings are necessary to reach a just and equitable solution;

4) Whether there is an alternative means of achieving an equitable distribution of assets;

5) Whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;

6) Whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and

7) The purpose for which bankruptcy jurisdiction has been sought.

*Id.* at 464–65; *see also In re Wythe Berry Fee Owner LLC*, No. 22-11340 (MG), 2023 WL 1786407, at *6 (Bankr. S.D.N.Y. Feb. 6, 2023) (same).

Finally, section 305(c) provides that an order under section 305(a) "is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of title 28 or by the Supreme Court of the United States under section 1254 of title 28." 11 U.S.C. § 305(c).

### D.  Abstention Pursuant to 28 U.S.C. § 1334(c)(1)[7]

Pursuant to 28 U.S.C. § 1334(c)(1), whether a bankruptcy court should adjudicate an adversary proceeding is subject to permissive abstention principles:

[N]othing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from

---

[7]    The Assignee does not indicate whether he is seeking abstention pursuant to subsection (c)(1) (permissive abstention) or (c)(2) (mandatory abstention).  However, a review of the Motion suggests that he is seeking abstention pursuant to subsection (c)(1).  (*See* Motion at 7–8 (discussing the seven factors that courts consider for abstention in connection with permissive abstention).)  Indeed, mandatory abstention under subsection (c)(2) only applies if each of the following is satisfied: "(1) the motion was timely brought; (2) the proceeding in federal court is based upon a state law claim; (3) the proceeding is related to a bankruptcy proceeding, but does not arise under Title 11 or arise in a Title 11 case; (4) section 1334 is the sole basis for federal jurisdiction; (5) an action is commenced in state court; and (6) the action can be timely adjudicated in state court." *In re Residential Cap., LLC*, 488 B.R. 565, 575 (Bankr. S.D.N.Y. 2013) (quoting *Allstate Ins. Co. v. CitiMortgage, Inc.*, No. 11 Civ. 1914 (RJS), 2012 WL 967582, at *6 (S.D.N.Y. Mar. 13, 2012)).  As the involuntary proceeding does not appear to be based on a state law claim, the Court does not believe that mandatory abstention applies.

> abstaining from hearing a particular proceeding arising under title 11 or
> arising in or related to a case under title 11.

28 U.S.C. § 1334(c)(1).

The movant bears the burden of establishing that permissive abstention is warranted in the face of the "virtually unflagging obligation" of federal courts to exercise their jurisdiction. *Residential Funding Co. LLC v. UBS Real Estate Sec., Inc. (In re Residential Cap., LLC)*, 515 B.R. 52, 67 (Bankr. S.D.N.Y. 2014). There is a presumption against abstention and courts should be "sparing in their exercise of discretionary abstention." *Id.*

Courts consider twelve factors when deciding whether to abstain from hearing a proceeding that is "related to a case under title 11." *See* 28 U.S.C. § 1334(c)(1); *In re Old Carco LLC*, 636 B.R. 347, 360 (Bankr. S.D.N.Y. 2022) ("Courts in this district consider twelve factors when determining whether to permissively abstain under section 1334(c)(1)." (citing *Delaware Tr. Co. v. Wilmington Tr., N.A.*, 534 B.R. 500, 512–13 (S.D.N.Y. 2015))). The factors to be considered in connection with determining a request for permissive abstention are:

> (1) the effect or lack thereof on the efficient administration of the estate if a
> Court recommends abstention, (2) the extent to which state law issues
> predominate over bankruptcy issues, (3) the difficulty or unsettled nature of
> the applicable state law, (4) the presence of a related proceeding
> commenced in state court or other nonbankruptcy court, (5) the
> jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of
> relatedness or remoteness of the proceeding to the main bankruptcy case,
> (7) the substance rather than form of an asserted 'core' proceeding, (8) the
> feasibility of severing state law claims from core bankruptcy matters to
> allow judgments to be entered in state court with enforcement left to the
> bankruptcy court, (9) the burden on the court's docket, (10) the likelihood
> that the commencement of the proceeding in a bankruptcy court involves
> forum shopping by one of the parties, (11) the existence of a right to a jury
> trial, and (12) the presence in the proceeding of nondebtor parties.

*Id.* at 357–58 (quoting *Delaware*, 534 B.R. at 512–13).

In considering whether permissive abstention is appropriate, courts have "considered one or more (not necessarily all) of [the] twelve factors." *Taub v. Taub*, 413 B.R. 81, 92–93 (Bankr.

23

E.D.N.Y. 2009) (quoting *Cody*, 281 B.R. at 190). Accordingly, the Court "need not plod through a discussion of each factor in the laundry lists developed in prior decisions," nor should analysis be "mechanical or mathematical exercise." *In re Janssen*, 396 B.R. 624, 636 (Bankr. E.D. Pa. 2008). Rather, "[t]he factors largely ask the Court to balance the federal interest in efficient bankruptcy administration against the interest of comity between the state and federal courts." *Fried v. Lehman Bros. Real Estate Assocs. III, L.P.*, 496 B.R. 706, 713 (S.D.N.Y. 2013). Ultimately, the inquiry "involves a thoughtful, complex assessment of what makes good sense in the totality of the circumstances." *Janssen*, 396 B.R. at 636 (quoting *Kerusa Co. LLC v. W10Z/515 Real Estate Ltd. P'ship*, 2004 WL 1048239, at *3 (S.D.N.Y. May 7, 2004)).

## III.    DISCUSSION

### A.  The Involuntary Chapter 7 Case Was Properly Commenced

As an initial matter, the Assignee does not dispute that the involuntary chapter 7 petition was properly commenced. Rather, he argues that dismissal is warranted because the bankruptcy case has "caused chaos and confusion with respect to the Assignment Proceeding," has had detrimental impact on "any sale of the Alleged Debtor's Assets," and the bankruptcy proceeding is otherwise duplicative of the Assignment Proceeding. (Motion at 3–4; *see also id.* at 5 (stating that dismissal may still be appropriate "[e]ven if a petition meets the statutory requirements of Section 303").) Indeed, it also does not appear that the Assignee disputes that at least three of the four Petitioning Creditors are creditors. (*See* Soldono Aff., Ex. B at 22–26 (listing, in the Assignment Proceeding, Karen Kane, SKI, and Rujo Boots as creditors with claims in excess of the statutory requirement).)

Given the absence of an objection, the Court considers the involuntary chapter 7 petition to have been properly filed.

**B.  Dismissal Pursuant to Section 707(a) is Not Warranted[8]**

As noted, courts will consider nine factors in determining whether an involuntary chapter

7 petition should be dismissed: "(1) the bankruptcy court was the most recent battlefield in a

long-running, two-party dispute; (2) [the creditor] brought the case solely to enforce a judgment;

(3) there were no competing creditors; (4) there was no need for *pari passu* distribution; (5)

assuming there were fraudulent transfers to be avoided, [the creditor] could do so in another

forum; (6) [the creditor] had adequate remedies to enforce its judgment under non-bankruptcy

law; (7) [the creditor] invoked the bankruptcy laws solely to secure a benefit . . . that it [did] not

have under non-bankruptcy law and without a creditor community to protect; (8) no assets would

be lost or dissipated in the event that the bankruptcy case did not continue; and (9) [the debtor]

did not want or need a bankruptcy discharge."  *Murray II*, 900 F.3d at 57.

Here, dismissal is not appropriate as the majority of the *Murray* factors do not weigh in

favor of dismissing the involuntary bankruptcy case.  Each of the factors is discussed below.

### 1.  Long-Running, Two-Party Dispute

It is clear that the present case involves more than a "long-running, two party-dispute."

Aside from the four Petitioning Creditors who filed the involuntary petition, CPH, who joins in

the Motion, is also involved, disagreeing, in fact, with the Petitioning Creditors as to how the

Alleged Debtor's situation should be addressed.  *Compare C-TC 9th Ave. P'ship v. Norton Co.*

*(In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1312 (2d Cir. 1997) (concluding that the dispute

was limited solely to two parties).  In addition to the Petitioning Creditors and CPH, there are

---

[8]    The Assignee also seeks dismissal pursuant to section 305(a) of the Bankruptcy Code, which pertains to
abstention.  Accordingly, the Court addresses the propriety of dismissal in its discussion of whether the Court should
abstain pursuant to section 305(a).  *See, e.g.*, *In re Schiff Fine Art*, LLC, No. 24-10039 (DSJ), 2024 WL 1085148, at
*9 (Bankr. S.D.N.Y. Mar. 12, 2024) (noting that seeking abstention under section 305 can take the form of dismissal
or a suspension of activity in a bankruptcy case).

also numerous other creditors of the Alleged Debtor.  Indeed, the Assignee disclosed that he has

"fielded calls from numerous creditors" and received "in excess of a dozen claims from

creditors."  (Motion at 3.)

Moreover, the Court has also not been the "latest battlefield," and the Assignee has not

argued otherwise.  While the Alleged Debtor's predecessor had a prior bankruptcy case before

the Delaware bankruptcy court, it was separate and apart from the circumstances that led to the

filing of this involuntary petition.

Accordingly, the first *Murray* factor does not weigh in favor of dismissal.

### 2.    Case Was Brought Solely to Enforce a Judgment

The immediate case was not brought solely to enforce a judgment as none of the

Petitioning Creditors have indicated that they have a judgment against the Alleged Debtor.  (*See*

Opposition ¶ 36 (stating also that the Petitioning Creditors have not initiated any other

proceedings against the Alleged Debtor prior to this chapter 7 petition).)

Accordingly, the second *Murray* factor does not weigh in favor of dismissal.

### 3.    Competing Creditors and the Need for *Pari Passu* Distribution

This present case clearly involves competing interests between numerous creditors,

including, at a minimum, the four Petitioning Creditors and CPH.  Exhibit B to the Sodono Aff.

contains a 5-page list of creditors of the Alleged Debtor in the Assignment Proceeding, which the

Petitioning Creditors allege fails to encompass all creditors, including Jump Design.  It is also

evident from CPH's joinder to the Motion that creditors of the Alleged Debtor have competing

interests as CPH adopts a different position from the Petitioning Creditors, lending further

support for the notion that *pari passu* distribution is needed.  *Compare Murray I*, 543 B.R. at 492

(concluding that there was no need for *pari passu* distribution where no other creditors were

involved).  Moreover, to the extent CPH does ultimately hold an unsecured deficiency claim

against the Alleged Debtor, its interests against other general unsecured creditors will also need

to be addressed.  There is support then that there are creditors "competing with each other to be

first in line to collect on claims."  *See Murray I*, 543 B.R. at 492.

Accordingly, the third and fourth *Murray* factors do not weigh in favor of dismissal.

### 4.   Avoidance of Fraudulent Transfers in Another Forum

NYDCL empowers an assignee to

> [B]ring an action or special proceeding, which he is hereby empowered to
> maintain, against any person who has received, taken or in any manner
> interfered with the estate, property or effects of the debtor in fraud of his
> creditors and which might have been avoided by a creditor of the assignor
> and the assignee may recover the property so transferred or its value.

N.Y. DEBT. & CRED. LAW § 15.

Here, the Petitioning Creditors argue that a chapter 7 trustee may have greater powers

than that of an assignee to seek recovery of such transfers as it has at its disposal nationwide

service of process, Federal Bankruptcy Rule 2004 powers to investigate, and the "strong arm

clause" under 11 U.S.C. § 544.  (*See* Opposition ¶ 38.)  As a result, they believe that this Court is

a more favorable forum for the pursuit of such actions.  (*Id.*)  However, the proper inquiry is not

whether one avenue is superior to another but whether one exists at all.  *See, e.g.*, *Murray I*, 543

B.R. at 492 (looking only to whether another forum existed for the avoidance of fraudulent

transfers "without resort to the bankruptcy court").  Thus, while the Court acknowledges that

there may be added benefits to having a bankruptcy trustee investigate and pursue the avoidance

of alleged fraudulent transfers, as it is the case that there is a means available for an Assignee to

do similarly under NYDCL, the fifth *Murray* factor weighs in favor of dismissal.[9]

### 5.  Adequate Remedies Under Non-Bankruptcy Law

The Petitioning Creditors are not seeking to enforce any judgment under non-bankruptcy

law and, as already discussed, there are competing creditor interests that support proceeding in

bankruptcy before this Court.  *See In re Newbury Operating LLC*, No. 20-12976-JLG, 2021 WL

1157977, at *8 (Bankr. S.D.N.Y. Mar. 25, 2021) (noting that this factor looked to whether the

party had adequate remedies to enforce its judgment under non-bankruptcy law).  Specifically,

the Petitioning Creditors have raised concerns that their interests are being adequately addressed

in the Assignment Proceeding, including whether the Assignee will investigate the propriety of

the alleged transfer of supplier cash.  A bankruptcy proceeding, as noted, would offer

transparency, the protection of a nationwide automatic stay, as well as the appointment of an

independent fiduciary with the ability to conduct service unconstrained by the jurisdictional

limits of a New York state court.  The benefits of the protection of a nationwide automatic stay

are particularly noteworthy here where the Alleged Debtors' creditors are spread across the

---

[9]      While the Court concludes that this factor does not weigh in favor of dismissal as a non-bankruptcy avenue
exists, the Court nonetheless agrees with the Petitioning Creditors that a bankruptcy proceeding can provide benefits
that are unavailable under New York state law.  This is particularly of note given the Petitioning Creditors'
allegations that supplier cash was improperly transferred to B. Riley, which the Assignee disputes.  As set forth in
the Huberman Decl., the Assignee submits that "all funds received from B. Riley were monies spent to pay regular
operating expenses of the Alleged Debtor and salaries of its employees."  (Huberman Decl. ¶ 12.)  Additionally, it
further provides that "no monies were paid by the Alleged Debtor to B. Riley other than interest payments on post-
emergence secured loans totaling approximately $125,000."  (*Id.*)  As for CPH, the Huberman Decl. further
indicates that "no payments were made to CPH at all in 2025, and if there were payments prior to that time, they
would have been made in the ordinary course and pursuant to the loan documents."  (*Id.* ¶ 13.)  Counsel to the
Assignee assured the Court at the Hearing that it would investigate these alleged transfers.  However, as will be
discussed in greater detail below, a bankruptcy proceeding will provide transparency and the added benefits of
nationwide service along with the protection of the automatic stay that an assignment for the benefit of the creditors
under New York law lacks.

United States and internationally.  (*See also* Sodono Aff., Ex. B at 22–26 (specifying the locations of each of the Alleged Debtor's creditors).)

Accordingly, the sixth *Murray* factor does not weigh in favor of dismissal.

### 6.  No Benefit or Creditor Community to Protect

It is more than evident that a creditor community exists that requires protection, and a bankruptcy proceeding can better address the competing creditor interests at play, including ensuring a proper allocation of estate assets.  *See Murray II*, 900 F.3d at 59 ("Involuntary bankruptcy petitions help ensure the orderly and fair distribution of an estate by giving creditors an alternative to watching nervously as assets are depleted, either by the debtor or by rival creditors who beat them to the courthouse.").  As reflected in an order the New York Supreme Court judge entered on April 16, 2025, the Alleged Debtor has "over 100 creditors (some international) all of whom need to be served."  (OSC at 2 n.1.)

The Court is concerned whether the Assignment Proceeding can sufficiently protect the interests of the creditor community.  *First*, the Petitioning Creditors have made clear that at least Jump Design and the Alleged Debtor's former employees did not receive notice of the filing of the Assignment Proceeding.  *Second*, while CPH consents to the sale to Cart.com and can benefit from a repayment of a portion of its loan, it is unclear whether the proposed transaction is the highest and best offer the Assignee could have obtained or the best transaction generally for the Alleged Debtor's estate and its creditors.  NYDCL does empower an assignee to sell a debtor's assets, providing:

> The judge may, upon the application of the assignee and for good and sufficient cause shown, and upon such terms as he may direct, authorize the assignee to sell, compromise or compound any claim or debt belonging to the estate of the debtor.  But such authority shall not prevent any party interested in the trust estate from showing upon the final accounting of such assignee that such debt or claim was fraudulently or negligently sold,

> compounded or compromised. The sale of any debt or claim heretofore made in good faith by any assignee shall be valid, subject, however, to the approval of the judge, and the assignee shall be charged with and be liable for, as part of the trust fund, any sum which might or ought to have been collected by him.
>
> All sales shall be had at public auction unless otherwise ordered by the judge. Upon application to the judge, and for good cause shown, the assignee may be authorized to sell any portion of the estate at private sale; in which case he shall keep an accurate record of each article sold, and the price received therefor, and to whom sold; which account he shall file at once. Upon application by the assignee or a creditor setting forth that a part or the whole of the estate is perishable, the nature and location of such perishable property, and that there will be loss if the same is not sold immediately, the judge, if satisfied of the facts stated and that the sale is required in the interest of the estate, may order the same to be sold with or without notice to creditors.

N.Y. DEBT. & CRED. LAW § 19. The Assignee has represented that a sale to Cart.com will be "subject to higher and better offers, [and] subject to the consent of CPH[] and approval by the Assignment Court." (Reply ¶ 13.) However, this alone does not fully allay the Court's concerns over whether the Assignment Proceeding can and has been adequately protecting the interests of the creditor community at large, which is comprised of dozens of creditors—a fundamental bankruptcy purpose. *See Murray II*, 900 F.3d at 62 (noting that an involuntary case commenced by four creditors had a "greater need for . . . collective remedies available only in bankruptcy court" as compared with a case that involved only "one creditor and [had] no risk of asset depletion in favor of other creditors").

Accordingly, the seventh *Murray* factor does not weigh in favor of dismissal.

7.   Loss or Dissipation of Assets

There is a clear risk of loss or dissipation of assets. The Assignee has already entered into an LOI for the sale of certain assets to Cart.com in the Assignment Proceeding. While non-binding, it raises concerns that, to the extent the bankruptcy proceeding is dismissed, the parties

will proceed with the transaction, which encompasses the sale of the Nogin commerce platform, certain intellectual property, and certain photo studio equipment. (*See* LOI, Schedule 1.)

Accordingly, the eighth *Murray* factor does not weigh in favor of dismissal.

### 8.    Want or Need for Bankruptcy Discharge

The ninth and final *Murray* factor weighs in favor of dismissal as the Alleged Debtor is a corporation that is ineligible to receive a bankruptcy discharge. *See* 11 U.S.C. § 727(a)(1) ("The court shall grant the debtor a discharge, unless— (1) the debtor is not an individual . . . .").

## C.  Abstention is Not Warranted

### 1.    Section 305(a)

As noted, abstention under section 305(a) of the Bankruptcy Code is an "extraordinary remedy" that is only warranted when both creditors and the debtor would be better off with dismissal. *Newbury*, 2021 WL 1157977, at *10 (quoting *In re Globo Comunicacoes e Participacoes S.A.*, 317 B.R. 235, 255 (S.D.N.Y. 2004)). As already discussed, it is the bankruptcy proceeding that may better serve the interests of both creditors and the Alleged Debtor, including ensuring that all creditor interests are accounted for and that value is maximized for the Alleged Debtor's estate.

Applying the factors articulated in *Monitor Single Lift*, the Court finds that abstention under section 305(a) is not warranted. Specifically, the Court can offer an efficient means for addressing the claims of the Alleged Debtor's estate (factor 1) in a just and equitable fashion (factor 3). Indeed, the Court has already indicated that, among other things, a bankruptcy's nationwide automatic stay, which is unavailable in an assignment for the benefit of creditors under New York law, can aid in preserving and maximizing value for the Alleged Debtor's estate and its creditors. Moreover, while the Assignment Proceeding is already pending in state court

and can offer an alternative means of distribution of assets, it is unclear that the Assignee has

sufficiently accounted for the interests of all creditors to do so in an equitable manner (factors 2

and 4).  The Petitioning Creditors have, in fact, represented that they filed the involuntary

petition to take advantage of the benefits that bankruptcy offers, which they believe exceeds

what the Assignment Proceeding can provide (factor 7).  Given that nothing substantial has

occurred in the Assignment Proceeding to date, it is not the case that the Assignment Proceeding

has gone so far that it would be costly and time consuming to "start afresh" here (factor 6.)

Accordingly, the Court will not abstain, either in the form of dismissal or suspension,

pursuant to section 305(a) of the Bankruptcy Code.

2.  <u>28 U.S.C. § 1334(c)(1)</u>

For similar reasons, permissive abstention pursuant to 28 U.S.C. § 1334(c)(1) is also not

warranted.  Applying the applicable factors articulated in *Old Carco*, it is unclear from the

present record that the Assignment Proceeding, which is not related to this involuntary chapter 7,

can adequately address the interests of all creditors of the Alleged Debtor and administer the

estate in a manner that would maximize value (factors 1, 4, 6, and 12).  State law issues do not

predominate, and it does not appear that there are any difficult or unsettled state law matters

involved (factors 2 and 3).  The Court also does not find that there will be a substantial burden on

its docket for this case to proceed (factor 9).  Moreover, there is no indication that the

commencement of this chapter 7 case was the product of forum shopping (factor 10).  As noted,

in general, there is a presumption against abstention.  *See Residential Cap., LLC*, 515 B.R. at 67

(stating that courts should be "sparing in their exercise of discretionary abstention" (quoting

*Kirschner v. Grant Thornton LLP (In re Refco, Inc. Sec. Litig.)*, 628 F.Supp.2d 432, 447

(S.D.N.Y.2008))).

In light of the foregoing, the Court will also not abstain pursuant to 28 U.S.C. § 1334(c)(1).

**D.  Damages/Sanctions are Not Warranted**

In addition, the Assignee also seeks payment of attorneys' fees and costs pursuant to section 303(i)(1), which provides:

> (i) If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—
>
> (1) against the petitioners and in favor of the debtor for—
>
> (A) costs; or
>
> (B) a reasonable attorney's fee . . . .

11 U.S.C. § 303(i)(1).

As the Court declines to dismiss the involuntary chapter 7 case, the Assignee's request for attorneys' fees and costs is also **DENIED**.

## IV.   <u>CONCLUSION</u>

For the reasons discussed, the Court **DENIES** the Motion.

**IT IS SO ORDERED.**

Dated:   June 11, 2025
New York, New York

_Martin Glenn_

MARTIN GLENN
Chief United States Bankruptcy Judge